UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
STUART TIEKERT,

Plaintiff,

- against -

VILLAGE OF MAMARONECK, *et al.*,

Defendants.
-----------------------------------------------------------x

**ORDER**

No. 23-CV-8714 (CS)

Appearances:

Brian M. Higbie
Law Offices of Brian M. Higbie
Ossining, New York
*Counsel for Plaintiff*

Donna Cook
Kaufman Dolowich, LLP
White Plains, New York
*Counsel for Defendants Frank Tavolacci and Charlotte Mountain*

Kennedi Fichtel
Elizabeth Del Cid
O'Hagan Meyer
New York, New York
*Counsel for Defendant Thomas Murphy*

Seibel, J.

Before the Court is Plaintiff's counsel's response, (ECF No. 95), to the Court's Order to Show Cause, (*see* Minute Entry dated July 29, 2026; ECF No. 89 (the "OSC")), why numerous case quotations and citations in his oppositions to Defendants' motions to dismiss, (ECF Nos. 80, 81 (collectively "Plaintiff's Oppositions")), did not violate Federal Rule of Civil Procedure 11.

# I. BACKGROUND

## A. Events Before the Court's July 29, 2026 Bench Ruling

On August 28, 2023, Plaintiff commenced this lawsuit in New York State Supreme Court, Westchester County. (*See* ECF Nos. 1-1, 1-2.) On October 4, 2023, Defendants removed the action to this Court. (*See* ECF No. 1.) During a bench ruling on March 5, 2025, the Court granted in part and denied in part the motion to dismiss of Defendants Thomas Murphy, Charlotte Mountain, Jerry Barberio, Dan Sarnoff, Dan Gray, Frank Tavolacci, Shawn Jimison, Robin Kramer and the Village of Mamaroneck, and granted Plaintiff leave to amend in limited respects. (*See* Minute Entry dated Mar. 5, 2025.) Plaintiff filed a Second Amended Complaint on April 25, 2025, (ECF No. 51), and after a pre-motion conference on October 1, 2025, Plaintiff filed a Third Amended Complaint on October 22, 2025 containing claims against only Murphy, Mountain and Tavolacci. (ECF No. 72.)

Murphy and Mountain filed separate motions to dismiss and accompanying memoranda of law, (ECF Nos. 75, 77), on November 20 and 21, 2025, respectively, and Plaintiff filed an opposition to each, (ECF No. 80 ("P's Opp. to Murphy"); ECF No. 81 ("P's Opp. to Mountain")), on December 26, 2025. In reply briefing filed January 9, 2026, (collectively "Defendants' Replies"), counsel for Murphy and Mountain both raised issues with certain case citations and quotations that Plaintiff's counsel, Mr. Brian Higbie, included in Plaintiff's Oppositions. (*See* ECF No. 82 ("Murphy Reply") at 6-8; ECF No. 84 ("Mountain Reply") at 4-7.) The Court will detail those issues below, but in general, counsel alerted the Court to misrepresentations of the holdings of cited cases and the inclusion of quotations that did not exist. Neither Defendant filed a separate motion for sanctions under Federal Rule of Civil

Procedure 11, although Murphy moved for dismissal under Federal Rule of Civil Procedure 41(b) for failure to comply with Rule 11. (Murphy Reply at 8-9.)

The Court ruled from the bench on the motions on July 29, 2026, (the "Bench Ruling"). Between the filing of Defendants' Replies on January 9 and the Bench Ruling on July 29, Mr. Higbie did not address the alleged errors in his papers. He also did not raise the issue when I asked counsel for the parties at the start of the proceeding whether any of them had anything to add that had not been covered by the papers. (*See* Transcript of July 29, 2026 Proceeding ("Tr.") at 2:15-17.)

### B. <u>Issues Detailed During July 29, 2026 Bench Ruling</u>

During the Bench Ruling, after addressing the merits, I discussed in detail the following misrepresentations and non-existent quotations that Defendants' Replies raised or that my chambers found in its own review. (*See id.* at 25:6-30:6.)

- Mr. Higbie cited *Back v. Hastings On Hudson Union Free School District*, 365 F.3d 107, 125-27 (2d Cir. 2004), stating, "In *Back v. Hastings on Hudson Union Free School District*, the Second Circuit held that a defendant may be liable where she 'participated in the decision-making process' or carried out discriminatory or retaliatory actions initiated by others." (P's Opp. to Mountain at 3, 4). I could not locate that quote, which Mr. Higbie included twice, in the decision. Additionally, the second half of the sentence – that a defendant may be liable where he "carried out discriminatory or retaliatory actions initiated by others" – also misrepresented *Back*'s holding. The Circuit held that a superintendent involved in an adverse employment decision did not have personal involvement in the alleged discrimination, even where he received a recommendation to take the action from other defendants who harbored discriminatory intent, because the superintendent was not motivated by an intent to discriminate or deliberately indifferent to others' discrimination. *Back*, 365 F.3d at 126-27. The decision thus not only does not support, but undermines, the proposition for which Mr. Higbie cited it.

- Mr. Higbie cited *Mangino v. Inc. Village of Patchogue*, 808 F.3d 951, 958-59 (2d Cir. 2015), stating, "in *Mangino v. Inc. Village of Patchogue*, the court sustained First Amendment retaliation claims against municipal code enforcement officials who selectively and maliciously enforced local laws in response to protected speech." (P's Opp. to Mountain at 4). The Circuit did not sustain a First

Amendment retaliation claim in *Mangino*. It stated that the district court erred in finding that the plaintiff was required to show that defendants' action chilled his protected speech, given that Second Circuit precedent, although a bit unclear at the time, permitted a First Amendment retaliation claim to proceed by showing either a chilling effect or some other concrete harm. *See Mangino*, 808 F.3d at 955-56. But the Circuit went on to affirm the dismissal of the claim. *Id.* at 956-57. It did not "sustain" it as Mr. Higbie claimed.

- Mr. Higbie cited *Dolan v. Connolly*, 794 F.3d 290, 295-96 (2d Cir. 2015), stating, "The Second Circuit has repeatedly held that retaliatory animus may be inferred from circumstantial evidence, including temporal proximity, a sequence of events suggesting retaliation, and departures from ordinary procedures." (P's Opp. to Mountain at 4.) Although this is a correct statement of law, and Mr. Higbie correctly relied on *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554-55 (2d Cir. 2001), for support as well, *Dolan* includes no discussion of this principle and addresses only whether a prisoner's filing a grievance on behalf of the prison population constituted protected activity, *see* 794 F.3d at 294-95. Additionally, Mr. Higbie quoted *Gorman-Bakos* as stating, "Close temporal proximity between protected speech and adverse action suffices to plead causation." (P's Opp. to Murphy at 5.) I could not locate this quote in the decision, even though it may fairly summarize statements of law in the opinion.

- Mr. Higbie attributed the following quotation to *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (*per curiam*): "Temporal proximity and allegations of retaliatory animus are sufficient to withstand dismissal." (P's Opp. to Murphy at 5.) I could not locate this quote in that decision, and the opinion discusses the injury element of a First Amendment retaliation claim, not causation. *See Dorsett*, 732 F.3d at 160-61.

- Mr. Higbie attributed the following quotation to *Dillon v. Morano*, 497 F.3d 247, 253 (2d Cir. 2007): "Causation is sufficiently pleaded where the complaint describes a chronology suggesting retaliation." (P's Opp. to Mountain at 5; P's Opp. to Murphy at 6.) I could not locate this quote in that decision.

- Mr. Higbie attributed the following quotation to *Ragbir v. Homan*, 923 F.3d 53, 67-68 (2d Cir. 2019): "Retaliatory animus can be plausibly pleaded without direct proof, courts must draw reasonable inferences in plaintiff's favor." (P's Opp. to Mountain at 5; P's Opp. to Murphy at 6.) I could not locate this quote in that decision. Defendants also noted, (Murphy Reply at 7-8; Mountain Reply at 5), that the judgment in *Ragbir* was vacated by *Pham v. Ragbir*, 592 U.S. 901 (2020), in light of the Supreme Court's decision in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020). To be sure, *Ragbir* was vacated on grounds other than the merits of the First Amendment retaliation claim, but Mr. Higbie still failed to note this subsequent history. On its own, this oversight might not have been worth mentioning, but given the other issues, it added to my concerns about Mr. Higbie's papers.

- Mr. Higbie cited *Dougherty v. Town of North Hempstead Board of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002), and *Davis v. Goord*, 320 F.3d 346, 359 (2d Cir. 2003), for propositions related to Defendants' qualified immunity defenses. (P's Opp. to Mountain at 6; P's Opp. to Murphy at 7-8.) But those cases never mention qualified immunity, and Mr. Higbie included a partial quotation to *Dougherty* in his opposition to Murphy's motion that I could not locate in the opinion. (P's Opp. to Murphy at 8.) Mr. Higbie also included a citation to *Mangino*, 808 F.3d at 959, for the proposition that "[w]here, as here, the complaint plausibly alleges intentional retaliation and selective enforcement, qualified immunity cannot be resolved without factual development." (P's Opp. to Mountain at 6.) But *Mangino* only discussed qualified immunity as it pertained to an abuse of process claim, and in any event the Circuit upheld the dismissal of the claim on the ground of qualified immunity. *See* 808 F.3d at 959. Similarly, Mr. Higbie cited *Kerman v. City of N.Y.*, 374 F.3d 93, 109 (2d Cir. 2004), in opposition to Murphy's argument for qualified immunity, with a parenthetical reading, "established law clearly prohibits retaliation for protected speech," (P's Opp. to Murphy at 8). But *Kerman* analyzes qualified immunity in the context of unlawful seizure and false imprisonment claims. *See* 374 F. 3d at 108-09, 116-117.

- Mr. Higbie cited *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013), for the proposition that "[e]ven if qualified immunity were appropriate at this stage, Murphy's contentions could not be resolved on a motion to dismiss where the facts as pleaded contradict that position." (P's Opp. to Murphy at 8.) *Gonzalez* was an appeal of a summary judgment decision in defendants' favor and affirmed the dismissal of the claims against the defendant officers on qualified immunity grounds. It does not come close to supporting the proposition for which Mr. Higbie cited it.

After detailing those inaccuracies, I discussed the legal standards under Federal Rules of Civil Procedure 11 and 41(b). (*See* Tr. at 30:11-32:8.) I then denied Murphy's request for dismissal under Rule 41(b), finding that result unwarranted based on the factors a district court must consider. *See Park v. Kim*, 91 F.4th 610, 612-13 (2d Cir. 2024) (*per curiam*). (*See* Tr. at 32:25-33:3.) Pursuant to Rule 11(c)(3), however, I ordered Mr. Higbie to show cause why the citations and quotations that I described during the Bench Ruling did not violate Rule 11, including how they came to be included in his papers, why he failed to confirm their veracity before including them, and what tools were used to prepare his papers. (*See* Tr. at 33:3-8.) Mr. Higbie was ordered to request the transcript of the proceeding and respond in writing within one

week, with responses from Defendant's counsel, if any, due a week after. (*See id.* at 33:8-12, 38:7-16.) When given an opportunity to provide an initial account of how he did his research if he so chose, Mr. Higbie stated he was "very ill at the time." (*Id.* at 37:10-15.)

### C. Mr. Higbie's and Defense Counsel's Responses

#### 1. Higbie's Response

After requesting additional time to respond to the OSC and confer with ethics counsel, (ECF No. 91), which I granted, (ECF No. 92), Mr. Higbie responded August 19, 2026, (ECF No. 95 ("Higbie Resp.")). Mr. Higbie acknowledged that he relied on ChatGPT, a generative artificial intelligence ("GenAI") chatbot, when researching and drafting his papers. (Higbie Resp. at 1.) He stated that he was aware of the risk that GenAI tools could fabricate legal authority, and previously had identified a hallucinated case citation, as well as a real but irrelevant case, that ChatGPT supplied when he used the tool in an unrelated matter. (*Id.* at 1-2.) He said he stopped using AI research tools based on that experience, but returned to them after an acquaintance in the AI industry told him "that ChatGPT fixed the fabrication problem." (*Id.* at 2.) According to Mr. Higbie, for each case that ChatGPT identified while working on Plaintiff's Oppositions, he confirmed that the case existed and was "in the right jurisdiction," (*id.* at 1), and "quickly reviewed" that it involved the relevant subject matter, (*id.* at 2), but he "did not independently verify the accuracy of the quotations or the characterizations of the holdings," (*id.* at 1). Mr. Higbie said the risk for this kind of error – *i.e.*, the tool generating a real case but with a fake quote or holding – did not occur to him as a possibility with GenAI, and he assumed that where ChatGPT generated quotes, the chatbot accurately scoured the case, functioning no differently than the "Ctrl + F" keyboard shortcut to search for text in a document. (*Id.* at 2.)

Mr. Higbie responded to each item that I raised during the Bench Ruling and withdrew the citations and quotations. (*See id.* at 3-6.) He also represented to the Court that the issues in Plaintiff's Oppositions were isolated to those briefs, and that "[t]here is no other filing, in this case or any other, that contains AI-assisted research I have not verified," including his opposition to the first motion to dismiss in this case. (*Id.* at 2, 6.)[1]

Mr. Higbie said that around the time that he prepared Plaintiff's Oppositions, he experienced "an intensification of a chronic health condition that among other things affects my physical and cognitive stamina" and that his family also experienced an unrelated job loss. (*Id.* at 7.) He also experienced heightened stress due to the two motions to dismiss in this case, which further intensified his symptoms. (*Id.*) Mr. Higbie did not request an extension for his opposition, although the parties submitted a joint amended briefing schedule, which the Court approved, that extended all parties' time due to the holidays. (*See* ECF Nos. 78-79.) He also did not bring on co-counsel to assist. (Higbie Resp. at 7.) Further, Mr. Higbie said that he turned to AI because he wanted to save costs for his client. (*See id.*)

Mr. Higbie said that he reviewed Defendants' Replies, although not closely, and knew that Defendants had "criticized my citations." (*Id.* at 3.) He checked the first case that Mountain flagged, concluded the criticism was not warranted, and stopped there. (*See id.*) During the Bench Ruling, I noted that not all of Defendants' concerns were necessarily founded, referring to the first part of Mountain's criticism, which argued that Plaintiff relied on factually irrelevant cases, (Mountain Reply at 4-5), as an example. (*See* Tr. at 24:22-25:1.) As I said during the Bench Ruling, there is nothing inherently improper in an attorney relying on an opinion that

[1] My chambers reviewed Mr. Higbie's opposition to the first motion to dismiss, (ECF No. 36), and did not identify similar issues.

involves different facts from the instant case, so long as they do not misrepresent those facts. (*See id.*) But rather than check the rest of the issues that Mountain raised, or any of the issues that Murphy raised, Mr. Higbie concluded that all of their criticisms were of the same ilk and "off base." (Higbie Resp. at 3.) Mr. Higbie concedes that his "verification was too shallow and too easily satisfied." (*Id.*)

Mr. Higbie apologized to the Court, its staff and Defendants' counsel for the burden his actions caused. (*Id.* at 8.) He also expressed regret for the impact on his own client, with whom he represented he had shared the transcript of the Bench Ruling. (*Id.* at 7-8.) Mr. Higbie further admitted that his actions violated Rule 11 and stated that going forward, he would check every quotation and characterization of a holding against the full text of the cited opinion. (*See id.* at 8.) He requested that if the Court were to impose a monetary sanction, it take into account his financial circumstances and the fact that his part-time law practice is the primary means of support for his family. (*Id.*)

**2. Defendants' Counsel's Response**

At the Bench Ruling, Defendants' counsel requested an opportunity to respond to Mr. Higbie's response, which I granted. (*See* Tr. 38:7-16.) Defendants' counsel both thanked Mr. Higbie for his candor and apology, but still requested reasonable attorney's fees for the cost incurred in responding to Mr. Higbie's papers. (*See* ECF No. 96 at 1; ECF No. 97 at 1.) Counsel for Mountain and Tavolacci requested $6,500, (ECF No. 96 at 1-2), while Counsel for Murphy requested $3,500, (ECF No. 97 at 1).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 11 requires that "[e]very pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name." Fed. R. Civ. P. 11(a). Rule 11 further states, in relevant part:

> By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]

*Id.* 11(b)(2). "When a party's legal contentions are challenged as violating Rule 11, 'the operative question is whether the argument is frivolous, *i.e.*, the legal position has no chance of success, and there is no reasonable argument to extend, modify, or reverse the law as it stands.'" *Black v. Ganieva*, No. 21-CV-8824, 2022 WL 2354916, at *13 (S.D.N.Y. June 30, 2022) (quoting *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011)).[2] "A legal argument may be sanctioned as frivolous when it amounts to an abuse of the adversary system," and "[t]he filing of papers without taking the necessary care in their preparation is an abuse of the judicial system that is subject to Rule 11 sanction." *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 460 (S.D.N.Y. 2023). "In short, Rule 11(b) imposes an affirmative duty on parties and counsel to ensure that all papers filed with the Court are factually and legally well-founded." *Barteca Holdings LLC v. Tacobarn Newtown LLC*, No. 26-CV-250, 2026 WL 2253785, at *2 (D. Conn. Aug. 4, 2026). "At the very least, the duties imposed by Rule 11 require that attorneys read, and thereby confirm the existence and validity of, the legal authorities on which they rely." *Park*, 91 F.4th at 615.

---

[2] Unless otherwise indicated, case quotations in this Order omit all internal citations, quotation marks, footnotes, and alterations.

Where another party is moving for sanctions under Rule 11, the party must do so "in a filing that is 'separate[ ] from any other motion' and that 'describe[s] the specific conduct that allegedly violates Rule 11(b).'" *Kyros L. P.C. v. World Wrestling Ent., Inc.*, 78 F.4th 532, 543 (2d Cir. 2023) (quoting Fed. R. Civ. P. 11(c)(2)). The party may not present the motion to the court until after the passage of a twenty-one-day safe harbor period, during which the person against whom the motion is brought can withdraw or correct the challenged filing. *See id.* Additionally, "[o]n its own, the court may order an attorney . . . to show cause why conduct specifically described in the order has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3); *see Kyros L.*, 78 F.4th at 543.

When Rule 11 has been violated, district courts have broad discretion to craft a sanction appropriate under the circumstances. *See Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 179 (2d Cir. 2012) (*per curiam*). Any sanctions decision, however, should be "made with restraint" because "the trial court may act as accuser, fact finder and sentencing judge." *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003). "When a court initiates Rule 11 sanctions *sua sponte* and the opportunity to correct or withdraw the challenged submission is unavailable, the court must make a finding of bad faith on the part of the attorney before imposing the sanctions." *Kyros L.*, 78 F.4th at 543. The Second Circuit has reasoned that "*sua sponte* [sanctions] without affording the offender the opportunity to withdraw the challenged document in the manner provided in the 'safe harbor' provision of Rule 11(c)(1)(A), is akin to the court's inherent power of contempt," which requires a finding of subjective bad faith. *Muhammad v. Walmart Stores E., L.P.*, 732 F.3d 104, 108 (2d Cir. 2013) (*per curiam*).

## III. DISCUSSION

### A. Rule 11 Violation

Amid the growing use of GenAI in legal research and writing, district courts are increasingly faced with the concerning problem of hallucinated legal authority. *See, e.g.*, *Barteca Holdings*, 2026 WL 2253785, at *1; *Jimenez-Fogarty v. Fogarty*, 831 F. Supp. 3d 253, 257-59 (S.D.N.Y. 2026); *Kaur v. Desso*, No. 25-CV-726, 2025 WL 1895859, at *1 (N.D.N.Y. July 9, 2025). As one district court described the phenomenon, AI-generated hallucinations often take one of three forms: (1) fabricated cases, meaning a citation to a decision that simply does not exist or is a real decision but is wholly unrelated; (2) fabricated quotations from an actual case; and (3) misstatements of law, including misrepresentations of case holdings. *See* *Andre v. Warden, FCI Danbury*, 827 F. Supp. 3d 294, 305 (D. Conn. 2025). "There is no question" that all three types of errors violate Rule 11(b) because reliance on any of them "does not constitute 'existing law' and certainly does not provide to the Court a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." *Lexos Media IP, LLC v. Overstock.com, Inc.*, No. 22-2324, 2026 WL 265581, at *10 (D. Kan. Feb. 2, 2026); *see Barteca Holdings*, 2026 WL 2253785, at *6-7 (finding Rule 11 violation where attorney relied on AI-hallucinated quotes and erroneous legal propositions but not wholly fabricated cases). Rule 11 is not violated simply because attorneys use GenAI, but rather because their inclusion of GenAI hallucinations in a filing demonstrates that they did not "read, and thereby confirm the existence and validity of, the legal authorities on which they rely." *Park*, 91 F.4th at 615.

Mr. Higbie violated Rule 11, which he readily admits. For each citation that the Court raised during the Bench Ruling, Mr. Higbie stated he either relied on a nonexistent quotation or

misrepresented the holding or a legal statement in the decision. (*See* Higbie Resp. at 2-6.) Mr. Higbie's "verification" was also wholly deficient to the point of being non-existent. Rather than read each case he cited, he merely confirmed its existence, jurisdiction, and general subject matter. (*Id.* at 2; *see id.* at 3 ("I did not verify the veracity of the characterizations of the cases noted before citing them in my brief, and that failure is the same regardless of how each one is ultimately characterized.").) That demonstrates a failure to conduct not just an adequate cite-check of a brief but any review in the first instance of the authorities that he was advancing before the Court. His conduct clearly failed the "reasonable inquiry" requirement of Rule 11. *See Barteca Holdings*, 2026 WL 2253785, at *4; *Kaur*, 2025 WL 1895859, at *3; *Benjamin v. Costco Wholesale Corp.*, 779 F. Supp. 3d 341, 348 (E.D.N.Y. 2025).

**B. <u>Bad Faith</u>**

"Generally, subjective bad faith requires a showing that the attorney has actual knowledge that a pleading or argument that he or she is advancing is frivolous." *Kaur*, 2025 WL 1895859, at *3 (emphasis omitted). But "[a]n assertion may be made in subjective bad faith even when it was based in confusion." *Mata*, 678 F. Supp. 3d at 463. Additionally, "[t]he requisite actual knowledge may be demonstrated by circumstantial evidence and inferred from conscious avoidance." *Estevez v. Berkeley Coll.*, No. 18-CV-10350, 2022 WL 17177971, at *1 (S.D.N.Y. Nov. 23, 2022). "The conscious avoidance test is met when a person consciously avoided learning a fact while aware of a high probability of its existence, unless the factfinder is persuaded that the person actually believed the contrary." *Mata*, 678 F. Supp. 3d at 463. Applying this standard, courts within the Second Circuit have found that reliance on nonexistent legal authority fabricated by GenAI constitutes bad faith under Rule 11. *See, e.g.*, *Barteca Holdings*, 2026 WL 2253785, at *4; *Jimenez-Fogarty*, 831 F. Supp. 3d at 264; *Benjamin*, 779 F.

Supp. 3d at 350. In *Jimenez-Fogarty*, the court identified two cases in which the presentation of erroneous AI-generated citations did not constitute bad faith, but noted that in both, the attorneys who submitted the fake cites had received them from another human with legal training and assumed – albeit erroneously – that no further verification was necessary. *See* 831 F. Supp. 3d at 265 (citing *United States v. Cohen*, 724 F. Supp. 3d 251 (S.D.N.Y. 2024), and *Hall v. Acad. Charter Sch.*, No. 24-CV-8630, 2025 WL 2256653 (E.D.N.Y. Aug. 7, 2025)).

Here, Mr. Higbie knew the citations he was presenting to the Court were supplied by GenAI and he submitted them without checking their veracity beyond confirming the existence of the case, jurisdiction and general subject matter. (Higbie Resp. at 2.) He further represented that he did not think GenAI tools like ChatGPT could fabricate quotes or supply erroneous holdings, which is why he did not investigate his citations further – let alone actually read the cases he was presenting to the Court. (*Id.*) But as already noted, this current episode is not the first time Mr. Higbie experienced an AI hallucination. He said that he previously used the tool in an unrelated matter and was presented with a fabricated case and an irrelevant case. (*Id.*) Although he stopped using GenAI for some unspecified period of time, he returned after he "bought into the hype" based on the representations of an acquaintance working in the AI industry. (*Id.*) Mr. Higbie also said that he returned to the tool for Plaintiff's Oppositions as a means of cost savings for his client. (*Id.* at 7.) Effectively, Mr. Higbie put blind trust in the bald assertions of an interested person without safeguards and in an effort to cut corners. He knew firsthand that there were risks to GenAI and verification of its output was needed, yet he conducted only the most superficial level of checks before presenting ChatGPT's work to the

Court.[3] This conduct is strong evidence of not only a profound misunderstanding about an emerging technology but also of conscious avoidance of the potential errors that he was introducing into his papers by relying on a tool he knew to be fallible.

Mr. Higbie's delay in providing a full accounting of his conduct further demonstrates bad faith. Delay in taking any remedial action when confronted with an accusation that fabricated legal authority was included in a submission has been found to contribute to bad faith. *See Kaur*, 2025 WL 1895859, at *3; *see also Barteca Holdings*, 2026 WL 2253785, at *3 ("The duty of candor extends beyond the moment of signature, it continues for as long as the filing remains before the Court."). Defendants' Replies alerted Mr. Higbie to the potential errors in early January 2026. (*See* ECF Nos. 82, 84; *see also* Higbie Resp. at 3 (recalling reviewing the "criticism" of his citations).) Rather than investigate each citation, he checked one, found it was not inaccurate, and washed his hands of the situation for months, (*see* Higbie Resp. at 3), until the Court confronted him during the Bench Ruling.

I also find Mr. Higbie's response to the OSC to be illogical on this point. He said that he reviewed Defendants' Replies, albeit not closely, but also that he concluded that Defendants' criticisms were off base and all of the same nature due to his review of the first citation that

[3] "While an inadequate inquiry may not suggest bad faith, the absence of any inquiry supports a finding of bad faith." *Mata*, 678 F. Supp. 3d at 464. Mr. Higbie's confirmation that the cases he received from ChatGPT were real, that ChatGPT attributed them to the correct court, and that their general subject matter was relevant may have been an inquiry into the basic details of the existence of the case, but it was no way an inquiry into whether his legal arguments were "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P 11(b)(2); *see Park*, 91 F.4th at 615 (noting Rule 11 and Second Circuit precedent require inquiry "into the validity of the arguments [the attorney] presented"). Determining that a given case is a real Second Circuit decision discussing § 1983 is not an inquiry into whether a legal position purportedly supported by that case is valid. Mr. Higbie's "verification" therefore in effect amounted to no inquiry at all.

Mountain addressed. (*See id.*) Yet even on a cursory read of Defendants' Replies, it is obvious that the first group of citations that Mountain flagged – citations to factually irrelevant cases – was fundamentally different from the rest of the issues that she and Murphy raised: non-existent quotations and misrepresented case holdings. (*See* Mountain Reply at 4-7; Murphy Reply at 6-8.) If Mr. Higbie cursorily reviewed Defendants' Replies, as he represents that he did, he would have known that he was being accused of providing fabricated quotes and case holdings, and he would not have needed to – and would have had no basis to – assume the nature of the rest of the issues flagged. Thus, Mr. Higbie's conduct after he was alerted to the false citations contributes to finding that he acted in bad faith. To be sure, Mr. Higbie otherwise expressed regret and apologized for his actions. (*See* Higbie Resp. at 8.) I do not doubt his sincerity, "[b]ut regret and apologies are not necessarily enough to avoid the imposition of sanctions for the submission of non-existent legal authority." *Benjamin*, 779 F. Supp. 3d at 350.

### C. Sanction

I next consider the appropriate sanction. "A sanction imposed under [Rule 11] must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4); *see Star Mark*, 682 F.3d at 179 ("underlying purpose of sanctions" is "to punish deviations from proper standards of conduct with a view toward encouraging future compliance and deterring further violations"). Rule 11 permits both monetary and nonmonetary sanctions to be imposed. *See* Fed. R. Civ. P 11(c)(4).[4] "In

[4] *Sua sponte* monetary sanctions are not permitted "unless [the court] issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned." Fed. R. Civ. P. 11(c)(5)(B). Both due process and the text of Rule 11 require notice and an opportunity to be heard before imposing sanctions. *See Nuwesra v. Merrill Lynch, Fenner & Smith, Inc.*, 174 F.3d 87, 92 (2d Cir. 1999) (*per curiam*). The Second Circuit has assumed, without deciding, that a

determining the appropriate sanction, courts focus not on compensation for the aggrieved party, but on the deterrence of baseless filings and the curbing of abuses." *Benjamin*, 779 F. Supp. 3d at 348. Courts faced with similar submissions of AI hallucinations have imposed monetary sanctions "[i]n nearly all cases" and ranging from $1,500 to $15,000. *Id.* at 347-48 (collecting cases); *see Barteca Holdings*, 2026 WL 2253785, at *6 (to the same effect). They have also imposed non-monetary sanctions, including, among others, requiring the attorney to attend relevant CLE programing and/or provide notice to their client, *see Kaur*, 2025 WL 1895859, at *4; *Gauthier v. Goodyear Tire & Rubber Co.*, No. 23-CV-281, 2024 WL 4882651, at *3 (E.D. Tex. Nov. 25, 2024), referring the attorney to applicable disciplinary authorities, *see United States v. Hayes*, 763 F. Supp. 3d 1054, 1073 (E.D. Cal. 2025), *reconsideration denied*, No. 24-CR-280, 2025 WL 1067323 (E.D. Cal. Apr. 9, 2025); *Park*, 91 F.4th at 615-16, and requiring the attorney to supply a copy of the court's order imposing sanctions to the presiding judge in each pending case where the attorney appears as attorney of record, *see Jimenez-Fogarty*, 831 F. Supp. 3d at 267.

Here, Mr. Higbie's misconduct was serious and implicates numerous potential harms to his client, Defendants and their counsel, the Court and its staff, and the judicial system. *See*

---

judge's statements on the record, absent a written show-cause order that details the specific Rule 11 violations at issue, sufficed under a prior version of Rule 11 to apprise the subject of possible sanctions of "the specific conduct that appears to violate [the rule]." *Id.* at 92 n.2. The Circuit has also upheld sanctions imposed under 28 U.S.C. § 1927 after an oral order to show cause. *See In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 118 (2d Cir. 2000). The OSC here gave Mr. Higbie notice and a reasonable opportunity to respond: I detailed on the record during the Bench Ruling the specific inadequacies with his briefing, (*see* Tr. at 25:6-30:6); I entered a written order after the Bench Ruling memorializing the OSC, (*see* ECF No. 89); I ordered him to order a copy of the transcript before responding to the OSC, (*see* Tr. at 33:10-12); he obtained the transcript and referred to it in his response, (*see* Higbie Resp. at 7); and he had extended time to review the transcript and possibly confer with ethics counsel before filing his response, (*see* ECF Nos. 91-92).

*Mata*, 678 F. Supp. 3d at 448-49. Although he expressed regret and apologized, he waited to do so until after he was ordered to show cause, and his explanation for his delay was wanting, as previously detailed. He was also aware that GenAI presented the risk of hallucinations but opted to use the tool anyway without verification of its output. To be sure, Mr. Higbie's conduct is not as brazen as that of some attorneys who were not as forthcoming with their use of AI and even continued to submit fabricated authority after being confronted. *See, e.g.*, *Jimenez-Fogarty*, 831 F. Supp. 3d at 261-62, 265-66. He also did not present wholly fabricated cases to the Court. *See Barteca Holdings*, 2026 WL 2253785, at *6. I also consider Mr. Higbie's representations about his health at the time of filing Plaintiff's Oppositions and his current financial situation. *See Star Mark*, 682 F.3d at 179 (no abuse of discretion in considering attorney's financial hardship when crafting Rule 11 sanction). He also does not appear to have any other pending matters in the Southern District of New York. Having considered all of the circumstances and balancing the above considerations, the Court concludes that the following are appropriate sanctions to deter future similar misconduct:

- Mr. Higbie is ordered to pay a sanction of $500 to the Court. Payment shall be made within 30 days of this Order and payable to the Clerk of Court, S.D.N.Y.
- Mr. Higbie is ordered to complete a minimum of two New York CLE credits in Ethics and Professionalism on the topic of AI and its ethical use in practice. Mr. Higbie shall submit verification that he completed the credits by no later than December 31, 2026.
- Any future filing submitted in this Court (before the undersigned or otherwise) by Mr. Higbie for which he used GenAI in his research or drafting must include a certification describing the portions of the submission with which GenAI assisted,

what GenAI tools he used, how he used those tools, and how he confirmed the veracity of any cases, quotations and legal statements that GenAI provided him and on which he relied in the submission. Failure to include this certification with any future filings that rely on GenAI may result in additional sanctions.

- Mr. Higbie shall serve a copy of this Order on Plaintiff Stuart Tiekert and file proof of service within 14 days of the date of this Order.

Finally, I consider Defendants' counsel's requests for attorney's fees. The text of Rule 11 and Second Circuit precedent are clear on this issue. A sanction imposed under Rule 11 may include an order directing payment of reasonable attorney's fees "if imposed on motion." Fed. R. Civ. P. 11(c)(4). "By its terms, the rule thus precludes a court from awarding attorneys' fees on its own initiative." *Nuwesra*, 174 F.3d at 94. "[A]bsent a specific motion for attorneys' fees, [a district] court only ha[s] authority to order sanctions payable to the court." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 57 (2d Cir. 2000); *accord Dakus v. Koninklijke Luchtvaart Maatschappij, N.V.*, No. 22-CV-7962, 2024 WL 4265646, at *6 (S.D.N.Y. Sep. 23, 2024); *Castro v. Mitchell*, 727 F. Supp. 2d 302, 309-10 (S.D.N.Y. 2010). Defendants did not file a separate Rule 11 motion, and Murphy's argument in his Reply seeking dismissal under Rule 41(b) for failure to comply with Rule 11, (*see* Murphy Reply at 8), is not a motion. I noted during the Bench Ruling that neither Defendant had made a Rule 11 motion, and cited Rule 11(c)(3) in ordering Mr. Higbie to show cause. (*See* Tr. 32:17-33:3.) Defendants' requests are therefore denied. While the Court appreciates that Defendants' counsel brought the issue of Mr. Higbie's citations to its attention, they are also reminded of the need to closely read the Federal Rules of Civil Procedure and related precedent before making such a request.

## IV. CONCLUSION

For the foregoing reasons, the Court imposes the sanctions set forth above pursuant to Rule 11.

**SO ORDERED.**

Dated: September 14, 2026
White Plains, New York

Cathy Seibel
CATHY SEIBEL, U.S.D.J.